## Louisville Gas & Electric Company and National Surety Company, et al. (104164) v. City of Louisville.

(Decided March 25, 1921.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

1. Pleading—Good on Demurrer.—An answer which either traverses the material allegations of the petition, or pleads such affirmative facts as avoid the effect of the petition is good.

2. Municipal Corporations—Bond by Gas Company.—A municipality may have a remedy on a bond given to it for the faithful performance of a contract to construct a pipe line from a given gas field to the city if it develops that the gas company failed to so construct or cause to be constructed the line and to equip it in the manner required by the franchise contract and bond, and this even though the failure of the gas company to so construct the line was not discovered until long after the line had been completed and put in operation.

3. Gas—Bond for Performance of Gas Contract.—A bond for $250,000 for the faithful performance of a contract to construct a pipe line and to begin to furnish gas within a given time will be treated as liquidated damages if the amount of loss suffered be difficult of ascertainment, or proof thereof is difficult to make, and the amount of the bond is not out of proportion to the loss actually sustained.

ALEX. P. HUMPHREY, MATT O'DOHERTY and CUMMINGS, RENNOR, FLYNN & McKENNA for appellants.

JOS. S. LAWTON for appellee.

Opinion of the Court by Judge Sampson—Reversing.

This cause was instituted by the city of Louisville against the Louisville Gas & Electric Company and the National Surety Company to recover $250,000 on a bond executed by the gas company to the city under section 6 of a franchise granted by the city to the gas company, by the terms of which franchise it was provided that the gas company "shall in forty days after the acceptance of the bid of grantee execute a bond to the city of Louisville with good and sufficient surety, to be approved by said city, in the sum of $250,000, conditioned upon the carrying out of the provisions of this section of this ordinance, as to the beginning, continuance and completion of the laying of said pipe line and beginning to furnish natural gas thereby." This ordinance was approved by the city March 29, 1913, and created a franchise or privilege of acquiring, laying, maintaining and operating in the streets, avenues, alleys and public ways of the city of Louisville a system of mains, pipes and appliances for the distribution and sale of natural gas, manufactured gas and mixed gas, and providing for the sale of said franchise. The first section of the franchise reads:

"Section 1. There is hereby created the franchise or privilege of acquiring, laying, maintaining and operating in the streets, avenues, alleys and public ways of the city of Louisville, Kentucky, a system of mains, pipes, fixtures and appliances for the distribution and sale of natural gas, manufactured gas and mixed gas for heating and lighting and other purposes."

The third section says:

"The grantee shall have the right, privilege, permission, authority, and franchise, subject to the provisions hereof and to all powers reserved to said city, to acquire, lay, construct, maintain and operate a system of mains and pipes, in, along, through and under the streets, avenues, alleys and public ways within the corporate boundaries of the city of Louisville as they now exist or may hereafter be extended and on and under the bridges and viaducts owned and controlled by said city for distributing and selling natural, manufactured and mixed gas."

The sixth provision of the franchise reads as follows:

"Said grantee, his successors or assigns, shall within sixty (60) days after the acceptance of this ordinance begin and continue to lay a main line or lines of pipe or

cause the same to be done from the most available source of supply of natural gas in the state of West Virginia to the city of Louisville, which said main line or lines shall consist of continuous piping and be a piping capable of withstanding a pressure of three hundred and fifty (350) pounds per square inch and be of a size having a capacity for supplying twelve million (12,000,000) cubic feet of gas per day to said city and provided with all necessary equipment to supply the capacity aforesaid, and said grantee shall complete said line or lines of pipe within one year from the passage and acceptance of this ordinance, unless prevented from so doing by the delays of *bona fide* litigation or by other cause or causes beyond the control of the grantee.   And said grantee shall immediately thereafter commence to supply natural gas to consumers up to the capacity aforesaid; provided that if the work herein authorized be delayed by injunction, *bona fide* litigation or by other cause or causes beyond the control of the grantee such delay or delays shall not be considered in estimating the time within which such work shall be commenced and completed and natural gas supplied.   Said supply of twelve million (12,000,000) cubic feet per day shall not be reduced by reason of any connections with said pipe line being made between the city of Louisville and the source of supply.   And said grantee, his successors or assigns, shall in forty (40) days after the acceptance of the bid of grantee execute a bond to the city of Louisville with good and sufficient surety, to be approved by said city in the sum of two hundred and fifty thousand ($250,000) dollars conditioned upon the carrying out of the provisions of this section of this ordinance as to the beginning, continuance and completion of the laying of said pipe line and beginning to furnish natural gas thereby and upon said conditions being fulfilled said bond shall terminate and sureties be released, and said bond shall be given as additional security to the bond provided for in section 7.''

This section of the franchise is the one under which this action was instituted, but sections 7 and 8, which we here copy, will aid in the consideration of the questions involved.

''Section 7. The grantee shall, within forty (40) days after the acceptance of the bid of grantee, execute a bond to the city of Louisville, with good and sufficient sureties to be approved by the city, in the sum of fifty thousand ($50,000.00) dollars, conditioned upon the faithful per-

formance and discharge of all the obligations imposed upon the grantee by this ordinance, including the obligations imposed by section 6 hereof, and conditioned that the grantee shall restore the sidewalks and pavements and all public ways to the original condition and maintain the same as provided in section 4, and shall save the city harmless from all loss and damage which may be done to its public ways or other property, or to persons or property of individuals by the conduct of the grantee's business, or arising out of the uses and privileges herein granted. Said bond shall be renewed from time to time as and when required by the city of Louisville. Said bond shall further be conditioned that the grantee shall defend all suits and pay all judgments against the city of Louisville and hold the city free from all liability arising out of the construction, maintenance or operation of the grantee's mains, conduits or other apparatus in the public ways of the city of Louisville.

"Section 8. The quality of natural gas, or natural and manufactured gas to be furnished shall be adequate and proper for the uses and purposes herein named and shall not be less than seven hundred (700) British thermal units to the cubic foot as furnished at the point of consumption, and the pressure at no time shall be less than three ounces nor less than twelve ounces to the square inch at the point of consumption, and these facts shall be ascertained by the gas inspector provided for in section 9 hereof, and in case the quality of gas furnished shall in any month for an aggregate period of seventy-two hours fall below said standard of seven hundred (700) British thermal units to the cubic foot at the point of consumption then the bills for that month of all consumers shall be reduced directly in the proportion that the average number of British thermal units furnished below said standard during any such period of seventy-two hours, or any period said gas falls below said standard above said period of seventy-two, shall bear to the standard of seven hundred (700) British thermal units established herein, and if the pressure at the point of consumption shall in any month for an aggregate period of seventy-two hours fall below said standard herein fixed, then all bills of consumers for gas furnished during said month shall be discounted 10 per cent from the net price or rate provided, and if said time that such natural gas falls below such standard in

such month exceeds seventy-two hours then said bills shall be discounted an additional 10 per cent for each additional seventy-two hours or portion thereof.''

Certain provisions of section 12 of the ordinance are relied upon by appellants, gas company, et al., and we here copy so much of section 12 as is pertinent to the issues:

"12.  The object of the franchise hereby created is to make available for the people of Louisville natural gas at a rate commensurate with the cost of natural gas to the people of other cities similarly situated and below the cost of manufactured gas, and said grantee shall take all reasonable precautions and measures necessary to furnish natural gas hereunder, during the life of this franchise, but in event said grantee shall, through no fault of his own, be unable to supply natural gas in sufficient quantities to meet the demand for same, and it shall become necessary to use a material quantity of manufactured gas, the grantee shall give written notice thereof to the mayor, the board of public works, and the general council and thereupon the board of public works shall, by experts employed by it, make a thorough investigation of all the facts relating to the inability of the grantee to supply natural gas and also of all the facts bearing on the reasonableness of rates for natural gas mixed with manufactured gas, or for manufactured gas, and in making said investigation said board or said experts shall have the right to examine the plant, business, books and records of said grantee and said board of public works shall, after a full hearing of the grantee, find whether or not said grantee's claim that he is unable to supply natural gas is well founded, and shall report said finding to the general council and also report all the facts which it has ascertained by said investigation, and the general council shall after considering said report and taking into consideration all the conditions surrounding the furnishing of said natural gas mixed with manufactured gas, or manufactured gas, fix reasonable rates to be charged therefor in the event it shall find that said grantee is unable to furnish natural gas in sufficient quantities as required by the franchise.''

In executing the bond required under section 6 above quoted, the National Surety Company became surety and co-obligor of the gas company and is therefore made a

party defendant. This bond for $250,000.00 is the one sued on, and reads as follows:

"KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Louisville Gas and Electric Company, a corporation organized under the laws of the state of Kentucky (hereinafter called the gas and electric company), as principal, and National Surety Company, a corporation organized under the laws of the state of New York, as surety, parties of the first part, and the city of Louisville (hereinafter called the city), party of the second part.

"WITNESS, that the said first parties are held and bound unto the city in the full sum of two hundred and fifty thousand ($250,000.00) dollars, payment whereof well and truly to be made, the said first parties do hereby bind themselves, their successors and assigns, firmly by these presents, as witness the hands and seals of the first parties hereunto affixed this July 8, 1913.

"The condition of the above obligation is such that, whereas the city, by an ordinance approved March 29, 1913, created and provided for the sale of a franchise or privilege of acquiring, laying, maintaining and operating in the streets, avenues, alleys and public ways of the city of Louisville, Kentucky, a system of mains, pipes and appliances for the distribution and the sale of natural gas, manufactured gas and mixed gas, and the sale of said franchise as therein provided was thereafter duly made and the Louisville Gas Company became the bidder at said sale and its bid was accepted by the general council of the city of Louisville, and payment was made by the Louisville Gas Company of the purchase price of said franchise, and since that date the Louisville Gas Company has by agreement of consolidation with sundry other companies, formed the gas and electric company, one of the parties of the first part, and by said agreement of consolidation said franchise has passed to said gas and electric company.

"Now, if the gas and electric company shall carry out the provisions of section 6 of said ordinance as to the beginning, continuance and completion of the laying of the pipe line therein described and the beginning to furnish natural gas thereby, the said pipe line to be a main line or lines of continuous piping from the most available source of supply of natural gas in the state of West Virginia to the city of Louisville and capable of

withstanding a pressure of three hundred and fifty (350) pounds per square inch and to be of a size having a capacity for supplying twelve million (12,000,000) cubic feet of gas per day to said city, and provided with all necessary equipment to supply the capacity aforesaid, then this obligation shall be void; otherwise in full force and virtue.''

The petition admits that the gas company within sixty days after it acquired the franchise in July, 1913, commenced to put down a twelve inch line of pipe from Louisville to Inez, Kentucky, a distance of about 180 miles, which reaches within about four miles of the West Virginia border, but it avers that the gas company did not lay down a line of pipe in accordance with section 6 of said franchise and the terms of the bond sued on.

The alleged breaches of the bond are briefly the following:

(1) The defendant never laid a main or any line or lines of pipe, or caused the same to be done, from the most available source of supply of natural gas in the state of West Virginia to the city of Louisville.

(2) That the line laid down by defendant company did not and does not constitute a continuous piping provided with all necessary or sufficient equipment required to supply a capacity of twelve million (12,000,000) cubic feet of gas per day to said city, and it is further alleged that defendant did not immediately after the completion of said line commence to supply natural gas to consumers in the city of Louisville up to twelve million (12,000,000) cubic feet of natural gas per day and never has supplied twelve million (12,000,000) cubic feet of natural gas to its consumers in said city, although its consumers and customers in said city have often demanded said amount of gas for their use.

(3) That defendant made connection with other pipe lines between the source of supply in West Virginia and the city of Louisville and thus reduced its ability to supply twelve million (12,000,000) cubic feet of gas per day, as per its contract and bond.

(4) That defendant knew and had full opportunity to know when it laid down its pipe line that it was connecting with a field of supply of natural gas in West Virginia which was deficient and inadequate as a source of supply to enable it to perform and carry out its obligations and the obligations of said bond.

(5)   That the defendant company never owned and does not now own any gas fields or wells, pipe lines or equipments in West Virginia for producing and supplying natural gas, but is merely transmitting and distributing gas which it purchased under a contract from the United Fuel Gas Company, a corporation operating in West Virginia.

(6)   That by the terms of the contract which the defendant gas company made with the United Fuel Gas Company of West Virginia to which the city of Louisville was not a party, it is provided that the city of Louisville shall only have the surplus supply of gas which the United Fuel Gas Company may have or acquire from its several sources after it has supplied certain other consumers, as follows: (a) The quantities of natural gas then deliverable to the Columbia Gas and Electric Company; (b) the quantities of natural gas necessary to supply at any and all times to the distributing company in the town of Portsmouth, Ohio; (c) such quantities not exceeding the capacity of an 18-inch pipe line as United Company shall then be delivering to the United Fuel Company; (d) such quantities not exceeding the capacity of an 18-inch pipe line as United Company shall then be delivering to the Hope Natural Gas Company; (e) such quantities not exceeding the capacity of a 10 inch pipe line as United Company shall then be delivering to the Central Kentucky Natural Gas Company.

The petition further alleges that the line of pipe from Louisville to Inez, Kentucky, was connected at the latter point with a sixteen-inch pipe line belonging to the United Fuel Supply Company, and with a 10-inch pipe line running to Lexington and other central Kentucky cities and towns, and this 16-inch line of the United Company was intended to supply gas to both the 12-inch Louisville line and the 10-inch Lexington and central Kentucky lines, but this 10-inch Lexington and central Kentucky line had a prior contract with the United Fuel Gas Company for a large supply of gas and this quantity, according to the contract referred to, was required for supply to Lexington and other central Kentucky towns before the city of Louisville was entitled to take any part of the gas carried in the 16-inch pipe line from West Virginia to Inez, Kentucky, and was further reduced by other pipe lines carrying gas to other con-

sumers, which consumers had priority rights in the gas over the city of Louisville.

The original answer of the defendant gas company is in five paragraphs, the first of which is a traverse with reservations and admissions. For instance, the first paragraph denies that "it did not lay down said pipe line in accordance with section 6 of said franchise and in accordance with said bond; . . . Denies that said defendant has not fulfilled the conditions of said bond and said section 6 of said franchise, or that it has violated said conditions, or any of them, or that it has never at any time carried out the provision of said section 6 of said franchise, or the provisions of said bond in any of the particulars in the petition named." But it admits that "it is true that the Louisville Gas and Electric Company has never owned nor does it now own any gas fields, gas wells or equipments in West Virginia for producing or supplying natural gas, but they deny that said defendant is merely a transmitting or distributing company." The answer further says "it is true that the defendant gets its supply of natural gas from West Virginia under a contract with the United Fuel Gas Company, a copy of which is filed with the petition. Defendant says it is true that the Louisville pipe line is connected at Inez, Kentucky, with a 16-inch pipe line belonging to the United Fuel Gas Company and not with the Fuel Supply Company named in the petition." It is also alleged that a 10-inch pipe line running to Lexington, Kentucky, had theretofore been connected at Inez with said 16-inch pipe line, but they deny that said connection was made at the same point or place that the Louisville line was connected. They say it is true that the said 16-inch pipe line of the United Fuel Gas Company runs from Inez into the state of Kentucky, and to a point in West Virginia called Kermit, and that at said point connected with other mains and pipe lines of the United Fuel Gas Company running to various gas fields in West Virginia.

The traverse also admits that small quantities of gas have been sold by the gas company from its line between its source of supply and the city of Louisville, and it admits that it furnished an inferior grade of natural gas from Meade county, Kentucky, to its customers in Louisville. There are other admissions in the first paragraphs of the answer.

The second and third paragraphs of the answer plead in bar of the maintenance of the present action, two other actions by the city of Louisville against the Louisville Gas and Electric Company, but these two paragraphs have been abandoned by the defendant and need not further be noticed.

The fourth paragraph of the answer pleads an estoppel. In fact a large part of the allegations of this paragraph read like a counterclaim, for it is averred that the gas company very generously bid in the franchise and paid $25,000 for it and then put in a pipe line with a capacity of fourteen million (14,000,000) cubic feet of gas per day, whereas they were only required to put in one of a capacity to carry twelve million (12,-000,000) cubic feet; that said pipe line was of a strength to resist a pressure of 400 pounds per square inch when the contract only required them to put in a pipe of the strength of 350 pounds to the square inch; that the gas company had a year from July 1, 1913, in which to complete its line and begin to furnish gas to the city of Louisville, but it made many sacrifices in order to sooner complete the line and to begin to furnish gas at an earlier date, and thus saved to the inhabitants of Louisville at least one hundred thousand ($100,000.00) dollars, which they would have paid for artificial gas in excess of the price paid for the natural gas. It also avers that it sustained certain losses by reason of its hurried construction of the pipe line.

It then avers that while it did allow certain landowners along the line of its pipe from whom the company had to obtain a right of way, the privilege of tapping its main line and thus obtain a supply of gas suited to their needs, it insists that the quantity thus taken was and is negligible and would not in any event exceed two per cent of the total supply of gas carried by the pipe. It next avers that the contract which it made with the United Fuel Gas Company of West Virginia, whereby the latter company was to furnish the gas to be carried to and sold in Louisville, was necessarily made subject to the contracts made by the United Fuel Gas Company with other concerns previous to the date of the contract made for the Louisville supply and was the best contract obtainable at that time and was subject to the priority rights of all the older contracts for gas supplying Cincinnati, Cleveland, Columbus, Portsmouth and

other cities, and it avers that this contract was made by it with the knowledge and consent of the city of Louisville; that the city of Louisville knew of the capacity and availability of the said gas field at the time it entered into the contract with the gas company, and further that the said city knew of the purpose and intention of the gas company to enter into said contract with the United Fuel Company of West Virginia, and it pleads and relies upon these facts as an estoppel against the city and its right to recover because the pipe line constructed by the gas company did not reach the most available source of supply of natural gas in the state of West Virginia, and as an estoppel to the city to complain of the nature and character of contract which the gas company made with the United Gas Company of West Virginia.

The fifth paragraph of the answer sets forth section 12 of the ordinance and prints in black letters that part thereof which says that the grantee (the gas company) "shall take all reasonable precautions and measures necessary to furnish natural gas" to the city of Louisville. It then avers that the winter of 1917-18 was unusually cold and that up to that time it had supplied the city of Louisville with ample gas, sometimes a greater quantity than twelve million (12,000,000) cubic feet per day, but owing to the extreme weather during the winter 1917-18, and the further fact that coal was high and the factories in the cities of Columbus, Portsmouth, Toledo, Cincinnati, and other cities used gas instead of coal in their work on war orders for the United States government the supply of natural gas from the West Virginia fields was depleted and the gas company was unable to supply, for only a few days, the demands for the city of Louisville under its contract in accordance with its charter provisions. It further says that while its line was of sufficient capacity and thoroughly equipped with all appliances necessary to supply the city of Louisville with twelve million (12,000,000) cubic feet of gas per day when this extreme weather in the winter of 1917-18 came on, it found for the first time that it needed compressors to force the gas through the pipe lines to the city, and that it immediately called upon the United Fuel Gas Company of West Virginia to provide and install compressors for the purpose and that the said United Gas Company did immediately place an order with a competent and responsible manufacturing establishment

for new and additional gas compressing machines which it contracted to have installed in operation at a given date; that the manufacturers entered upon the performance of the contract to make and install the compressing machinery, but before said contract was or could be complied with the war department of the United States government, acting under and in pursuance of the powers vested in it by the Constitution and laws of the United States, issued a priority order to the said manufacturer by which it was compelled to suspend the further execution of the said contract with the said United Fuel Gas Company and to execute instead certain other orders for the United States government given priority thereto, and the gas company pleads and relies upon its inability owing to the government priority order, to get said compressors, as a defense to the claim of the city in this action.

The fourth paragraph of the answer was amended but the amendment only set out with greater particularity the facts upon which the gas company relied as an estoppel in the original answer.

A general demurrer was filed to the answer as amended and in sustaining this general demurrer the court delivered an exhaustive and able opinion, covering more than forty printed pages in the record.

A second amended answer was then filed by the gas company, to which a general demurrer was also sustained by the court, and another opinion delivered dealing in large part with the same questions discussed in his first opinion.

A third amended answer was then filed and a general demurrer was interposed to the answer as amended for the third time and again sustained, and an opinion delivered by the learned circuit judge.

The city then moved the court for a judgment on the pleadings, to which the defendant gas company objected, and the motion being submitted and the gas company declining to further plead, its objection to the submission on the motion for a judgment on the pleading was overruled and the motion sustained, whereupon it was adjudged by the court that the plaintiff, city of Louisville, recover of the defendant, Louisville Gas and Electric Company, and the National Surety Company, the sum of two hundred and fifty thousand ($250,000.00) dollars

with interest, etc. From this judgment the gas company and surety company appeal.

The appellants make the following contentions:

(1) The trial court construed the ordinance as requiring the gas company not only to begin to furnish 12,000,000 feet of gas per day as demanded, within one year after the purchase of the franchise, but that there was a continuing contract to furnish this quantity during the whole twenty years of the franchise.

(2) That this obligation upon the part of the gas company was included in and secured by the terms of the bond sued on.

(3) That the following language in section 6: "Said supply of twelve million (12,000,000) cubic feet per day shall not be reduced by reason of any connections with said pipe line being made between the city of Louisville and the source of supply," was a hard and fast inhibition against the gas company's making such connections, and not an inhibition limited to such a connection as would reduce the amount of gas that should be furnished the city below 12,000,000 feet of gas per day.

(4) That this inhibition against the making of such connections was included within the terms of the bond.

(5) That although the gas company did complete its pipe line in strict conformity to the terms of section 6, and did begin to furnish gas to the extent of 12,000,000 feet a day as demanded, within a year subsequent to its purchase of the franchise, and continued so to do down to December, 1917 (except for 40 hours in February, 1917), yet its failure to furnish the 12,000,000 feet of gas per day during the winter of 1917-18, connected with the character of contract which it made with the United Fuel Gas Company of West Virginia, constituted a breach of section 6 of the franchise ordinance, and of the terms of the bond.

The brief of appellant then argues the same contentions as follows:

(1) So far as concerns an obligation on the part of the gas company to furnish the 12,000,000 feet of gas per day during the life of the franchise we have this to say, that we have been utterly unable to find any language in any part of this franchise ordinance that requires this, and have applied in vain to the court and counsel to point out any such language. The most that

can be said is that under section 12 of the ordinance it is provided as follows:

"The object of the franchise hereby created is to make available for the people of Louisville natural gas, at a rate commensurate with the cost of natural gas to the people of other cities similarly situated, and below the cost of manufactured gas, and said grantee shall take all reasonable precautions and measures necessary to furnish natural gas hereunder during the life of this franchise."

This section goes on to provide that if the gas company finds that through no fault of its own it is unable to supply natural gas in sufficient quantities to meet the demand for the same, it shall give a certain notice to the board of public works of the city of Louisville of that fact.

(2) There is absolutely no language whatsoever in the bond imposing any such obligation. On the contrary, the bond speaks of "beginning to furnish natural gas thereby," viz., by the completion of the pipe line, and says nothing whatever in reference to any obligation to continue to furnish the gas during the currency of the franchise.

(3) and (4) There is absolutely nothing contained in the language of the bond to the effect that the gas company will not make connections with its line for the purpose of supplying other people or other communities with gas through its pipe line. However this clause in regard to making connections shall be construed—whether as an absolute inhibition of making any connection, or simply an inhibition against making a connection, which will prevent the proper supply to the city of Louisville—there is absolutely nothing in the terms of the bond that concerns this matter in one way or the other. And just here we may suggest this: Suppose five years after this pipe line had been laid the gas company had made such a connection could it possibly be said that this involved a breach of this particular bond?

(5) Again we must consider, in the solution of this case, whether a failure of gas supply four years and more after the completion of the pipe line can be taken as a breach of the bond sued on.

In determining the question now before the court it must be always carefully kept in mind that by the terms of section 6 of the ordinance the bond therein provided

for was expressly declared to be a temporary bond; that is to say, the conclusion of section 6 provides:

"And upon said conditions being fulfilled said bond shall terminate and said sureties be released."

To the foregoing arguments the appellee city says:

(1)   That the basic reasons for violations of the bond were the limitations placed in appellant's contract with United Company and agreed to by appellant before appellant completed its line, together with the connections to its line whereby a supply of twelve million cubic feet to Louisville was reduced, which contract and connections vested said United Company with the right and power from the very beginning to shut off the gas to Louisville whenever the contingencies referred to in said contract between United Company and appellant might arise. Said contract rendered appellant company powerless to control the supply of gas necessary to fulfill its franchise obligations covered by this bond.

(2)   Appellant, within a year from the acceptance of this franchise, made and has continued to rely on a contract with another corporation to supply the gas which appellant company agreed to furnish to the city, and has by that contract placed it in the power of said other corporation to, at any time during the continuance of the defendant's franchise, withhold any part or completely shut off the supply of gas necessary to fulfill the obligations of its franchise. A present capacity, power and means to fulfill its franchise obligation were never possessed by the appellant within one year after the acceptance of the franchise; appellant gas company did not lay down a main line or cause the same to be done to the most available source of supply of natural gas from the state of West Virginia to the city and did not provide said line with all necessary equipment to supply a capacity of twelve million cubic feet and appellant company made connections with its pipe line whereby the supply of twelve million cubic feet per day was reduced; and

(4)   The plea of impossibility of performance is not tenable in this action because the conditions which appellant gas company now offers as an excuse for non-performance of the obligations of this bond were made effective solely by its voluntary and unauthorized acts. If it had not entered into such a contract with the United Company, putting Louisville in such a subordinate posi-

tion, and had not made such connections to its line reducing the supply, contrary to the very letter and spirit of this bond, none of the conditions now offered as its excuse could have in any way affected Louisville's supply.

The question is, does the answer of the gas company, as a whole, present a defense to the action of the city? As all of the material allegations of the petition were either controverted or avoided by what we regard as a sufficient affirmative pleading, we think it does.

While the bond sued on is a temporary bond, intended to guarantee the faithful performance of the construction contract, yet if the pipe line was not constructed within the year so as to conform to the franchise contract and by reason of the failure of the gas company to keep and perform the terms of the contract guaranteed by the bond, the supply of gas was insufficient or the pressure too low, a recovery may be had by the city, even at this time, if the failure to perform the contract was not sooner discovered.

This litigation only calls for a correct construction and interpretation of the franchise ordinance, especially section 6 thereof, and the bond sued on. The parties do not agree about the meaning of these two instruments. It was the object of the city of Louisville in granting the franchise to obtain, if possible, for its citizens an adequate and regular supply of natural gas at reasonable rates. The gas company desired to and it did obtain practically the exclusive right to engage in the business of distributing and selling gas in the city of Louisville, out of which it expected a profit. So in dealing the parties finally entered into an agreement which is evidenced by the ordinance contract. The storm center of this controversy is around section 6 of the contract which required the gas company not only to do certain construction work and other things, but to give a bond in the sum of two hundred and fifty thousand ($250,000) dollars for the faithful performance of this undertaking.

The gas company agreed to begin, or cause to be begun, within sixty (60) days from the acceptance of the ordinance, the building of a pipe line or lines of a size and capacity to reasonably carry 12,000,000 cubic feet of gas per day from the most available source of supply of natural gas in the state of West Virginia, to the city of Louisville, and to prosecute said work diligently and com-

plete said pipe line and begin to furnish gas thereby within one year from said date. The line or lines were to be a continuous piping—not broken—from source to consumption, capable of withstanding a pressure of three hundred and fifty (350) pounds per square inch, and provided with all necessary equipment to supply twelve million (12,000,000) cubic feet of gas per day to the city of Louisville. It was further agreed that the gas company should immediately upon the completion of the line aforesaid, commence to supply natural gas to consumers in said city up to 12,000,000 cubic feet per day; but there is no provision in the bond guaranteeing the gas company to continue to supply said quantity of gas to said city, except that the gas company by the contract was not to make or allow any connections to be made with its main pipe line between the source of supply and the said city which would reduce the supply of gas to said city below 12,000,-000 cubic feet per day. Undoubtedly the contracting parties contemplated and intended to and did contract for a supply of natural gas of not less than 12,000,000 cubic feet per day, when required.

The conditions of the bond are not as broad as the contract, for the bond only undertakes to guarantee the commencement of the work within sixty days, the prosecution of the work with reasonable diligence, and the completion thereof within one year from the acceptance of the franchise and the immediate beginning to furnish gas thereby up to the capacity of the line or lines, twelve million (12,-000,000) cubic feet. It does not mention the three ounce gas pressure required at the point of consumption by section 7 of the ordinance, nor the prohibition against connections by consumers with the main pipe line between the source of supply and the city of Louisville.

As work on the pipe line was promptly commenced, prosecuted with diligence and completed, if completed at all, within less than the time given in the contract and bond, there can be no recovery by the city in this action unless the bond was breached by the failure of the gas company to carry the pipe line to and connect it with the then most available source of supply of natural gas in the state of West Virginia, or failed to equip the pipe line with such machinery in the nature of compressors or forcing fans as was reasonably necessary to drive twelve million (12,000,000) cubic feet of gas in cold and unfavorable weather through the pipe from the gas fields to the city of Louisville. If the gas company failed in either

of these particulars, it and its surety are liable on the bond.

The petition avers a want of performance on the part of the gas company in both these particulars, as well as many others. The answer traverses part of the material averments of the petition, and pleads affirmatively in avoidance of the others. In answer to the allegations of the petition that the pipe line was not constructed by the gas company to the most available source of supply of natural gas in the state of West Virginia, the answer says: "It (gas company) immediately proceeded to acquire and did acquire rights of way for the pipe line, in the said ordinance referred to, from the city of Louisville to the West Virginia line, a distance of almost 200 miles, and that it immediately and at great expense and outlay, proceeded thereafter to construct a pipe line, and did construct said pipe line, consisting of continuous piping, from the most available source of supply of natural gas in the state of West Virginia to the city of Louisville. Defendants say that said pipe line, at Inez, a point within about four miles of the West Virginia line connected with the sixteen inch pipe line of the United Fuel Gas Company which extended from said point to Kermit, in West Virginia, and to the West Virginia gas fields, with which said 16-inch pipe line was connected with various mains and pipes. Defendants say that said pipe line was constructed and laid in the most approved manner, and that it was an iron pipe, twelve inches in diameter, capable of withstanding a pressure of four hundred pounds to the square inch, instead of three hundred and fifty pounds to the square inch, as in said franchise ordinance called for, and having a capacity for supplying over fourteen million cubic feet of gas per day, instead of the twelve million cubic feet of gas per day, provided for in the said franchise ordinance, and was provided with all the necessary equipments to supply the capacity aforesaid. . . .

"Defendants say that the West Virginia gas field with which the defendant, Louisville Gas and Electric Company's, said pipe line was connected, as herein set out, had, at the time, an output capacity of natural gas available for said defendant under its contract with the United Fuel Gas Company, in the petition set out, greatly in excess of the requirements of said defendant under its contract with the plaintiff, and was able to furnish to said defendant and to said pipe line much more than 12,000,-

000 cubic feet of natural gas per day, having a heating capacity far in excess of 700 British thermal units to the cubic foot, and that from the time it made the said connection and began to furnish gas on March 12, 1914, until December 10, 1917, excepting only for a period of about forty hours in February, 1917, said defendant was ready and able to furnish 12,000,000 cubic feet of gas per day to the city of Louisville, and did furnish far in excess of said amount of gas per day to the said city, on several days during said period and whenever demanded.

"Defendants say that the United Fuel Gas Company, with which company the contract for natural gas for the city of Louisville was secured, as in the petition set out, and a copy of which is filed with the petition, is one of the largest and most responsible natural gas companies in the state of West Virginia, if not the largest, as defendants believe it is, and that the contract made with it, as aforesaid, was the best contract for natural gas then obtainable or that could be secured; that the cities of Cincinnati, Cleveland, Toledo, Columbus, and the town of Portsmouth, Ohio, in the petition referred to, obtain their gas supply under similar contracts, by or through the United Fuel Gas Company, or its subsidiaries; that all such contracts made by the said company and others in like business, for furnishing gas to cities or towns, are made subject to contracts theretofore made. The contract of the United Fuel Gas Company with the defendant, Louisville Gas and Electric Company, for furnishing gas, was necessarily made subject to contracts theretofore entered into by it, to furnish gas to other cities in the said contract mentioned, which had earlier contracts with the said company, which entitled them to such priority, just as the contract of the said Fuel Gas Company with said defendant has and is given priority over other contracts for natural gas made by it and other cities, since the date of said contract with said defendant."

Neither the contract nor bond required the gas company itself to build or own the pipe line, but it guaranteed only the building of such a line or causing it to be built, and was required to have only such ownership or control over the line for the life of the franchise as to insure a compliance with its terms. If the entire line had been constructed by another, or if owned by another there is no breach of the bond unless the gas company has no such control over the line as will enable it to carry out its franchise contract. In this view the answer presented a

good defense in so far as the petition relies upon a failure to construct a continuous pipe line. But if upon the trial it is shown that the pipe line does not reach and connect with the then most available source of supply of natural gas in the state of West Virginia, or that the line is either owned or controlled by the gas company in such way as not to enable it to carry out its franchise contract, the city may recover.

It is common knowledge that gas will not flow as freely in cold weather as it does in warm, and the colder the weather the less the flow of gas. These facts were in the possession of the gas company at the time of the acceptance of the ordinance. It was its duty, therefore, to anticipate that when cold weather came the gas in its pipes would not flow as freely as in warm weather and in very cold weather it would be worse, and to provide the pipe line with such compressors or forcing fans as would drive the gas through the pipe lines from the source of supply in West Virginia to the city of Louisville in the coldest weather and worse conditions that could reasonably have been expected to occur in the region where the pipe line lies. If the gas company failed to perform this duty and as a result thereof the gas supply and pressure in the city of Louisville fell below that for which the contract calls, the pipe line was not constructed or completed according to the contract and bond within one year from the date of the acceptance of the franchise and the gas company is liable on its bond.

The affirmative paragraphs of the answer of the gas company show that the line was equipped with all necessary machinery to force the gas through the pipe line in all but unusually cold weather which the gas company could not have reasonably anticipated, and did not, or have cause to expect along or on the line of its pipe. This answer was therefore good and the demurrer should have been ovrruled as to it. Whether it can sustain these averments by evidence remains to be seen. Undoubtedly the bond sued on must be treated as liquidated damages and not as a penalty. It would be well nigh if not absolutely impossible to ascertain the amount of loss or damage sustained by the city through the failure of the gas company to comply with the terms of section 6 of the ordinance, if it did fail. Our rule is to hold the sum named in a bond liquidated damages where the loss resulting from the breach of the agreement would be very uncertain and evidence of this amount very difficult to obtain,

and the fair import of the agreement is that the amount of money named in the bond was specified and agreed upon by the parties to save expense and avoid the difficulty of proving the actual damage, and is not out of proportion to the actual damage sustained. Commonwealth v. Ginn & Co., 111 Ky. 110; American Book Co. v. Wells, 26 R. 1159; Gropp v. Perkins, 148 Ky. 183; United States Steel Co., 205 U. S. 105; Sun Publishing Co. v. Moore, 183 U. S. 642; Fiscal Court v. Public Service Co., 181 Ky. 245; Scott's Admr. v. City of Mayfield, 153 Ky. 278.

About the same time this action was commenced another suit was begun by the city on the fifty thousand ($50,000) dollar bond for which provision is made in section 7 of the city ordinance, copied above, which suit proceeded to judgment much as this one, the city being adjudged the full penalty of that bond, from which judgment an appeal was also prosecuted to this court. That judgment was, by an opinion of this court this day delivered, reversed upon the ground that the city, as an entity, had and can maintain no action for the damage, if any, sustained by individual gas users, but such action can only be prosecuted by the individual or consumer suffering the loss or damage of which complaint is made. See Louisville Gas and Electric Company v. City of Louisville, 191 Ky. 789.

For the reasons indicated the judgment is reversed for proceedings consistent with this opinion.

Judgment reversed. Whole court except Judge Quin sitting.